**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CHERRY LYN MICLAT, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>ADVANCED CARE STAFFING, LLC, PRIORITY CARE STAFFING, LLC, and SAM KLEIN,<br><br>*Defendants.* | Civ. Action No.: 23-cv-5296<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Cherry Lyn Miclat, individually and on behalf of all others similarly situated, by her undersigned attorneys Kakalec Law PLLC, Towards Justice, Nichols Kaster, PLLP, and Nichols Kaster, LLP, for her Complaint, alleges as follows:

### INTRODUCTION

1.      Defendants Advanced Care Staffing, LLC ("ACS") and Priority Care Staffing, LLC ("PCS") are labor recruiters that recruit, hire, and place foreign nurses and other healthcare workers to work in healthcare facilities in the United States. Defendant Sam Klein, an individual, is the Chief Executive Officer of ACS and PCS, and a Member of PCS.

2.      According to its website, ACS has placed thousands of healthcare workers in positions throughout the New York-New Jersey-Connecticut area in the last decade.[1]

3.      When these workers, including Plaintiff, arrive in the United States, they frequently find themselves trapped in dangerous and grueling jobs. Defendants prohibit these workers from leaving their employment for years unless they pay tens of thousands of dollars. Defendants follow

---

[1] *See* Advanced Care Staffing, "About," https://advancedcarestaffing.com/about/ (accessed July 6, 2023).

through on their threats to require these payments by workers by initiating arbitration against workers who dare to leave.

4.      Plaintiff Cherry Lyn Miclat is an immigrant nurse who came to the United States from the Philippines on a visa sponsored by PCS and ACS. After entering the United States in 2022, she confronted unmanageable and unsafe working conditions that she believed threatened her nursing license—including unmanageable patient loads, insufficient support, and wildly unpredictable and unreasonable hours.

5.      Defendants profit from this scheme of placing immigrant nurses into positions that the nurses cannot freely leave. The healthcare facilities pay the nurses' wages to Defendants and Defendants provide only a fraction of those wages to the nurses. Defendants attempt to recoup even more money by initiating arbitration proceedings against workers who dare to leave before Defendants have made enough profits from their labor.

6.      After enduring working conditions that Ms. Miclat believed threatened not only her health, but the health of her patients and, as a result, her nursing license, Ms. Miclat decided her only option was to quit her job with ACS, notwithstanding the huge debt which she feared she might incur.

7.      This lawsuit seeks to end Defendants' illegal practices and to compensate victims through two categories of claims.

8.      First, Ms. Miclat, on her own behalf and on behalf of those similarly situated, asserts forced labor claims under federal and state law. Employers are not permitted to use or to attempt to use the threat of substantial harm, including financial harm, or abuse of legal process to keep workers trapped in their jobs. Defendants' threat of extraordinary financial penalties to be enforced through arbitration proceedings violates federal and state forced labor laws and

contravenes the spirit of a competitive labor market to the detriment of Defendants' workers and their competitors who play by the rules.

9.      Second, Ms. Miclat, on her own behalf and on behalf of those similarly situated, asserts claims under state wage laws based on the penalties Defendants require workers to pay to leave Defendants' employ before their contractual employment period ends. These penalties are grossly disproportionate to any actual expenses that Defendants incurred solely for the employees' benefit. Rather, Defendants use the money to pad their own profits. Even more, Defendants threaten workers with the financial burden of arbitration, including seeking repayment of the costs of arbitration and Defendants' attorneys' fees. In other words, Defendants attempt to place the burden of doing business squarely on the backs of the nurses they profit from, in violation of state wage laws.

## THE PARTIES

10.     Advanced Care Staffing, LLC ("ACS") is a New York limited liability company with its main office located at 1000 Gates Avenue Ste. 5B, Brooklyn, NY 11801.

11.     Priority Care Staffing, LLC ("PCS") is a New York limited liability company formed in Kings County.

12.     Defendant Sam Klein is an individual who resides in Brooklyn, and serves as the Chief Executive Officer of ACS and PCS.

13.     Klein is also a Member of PCS.

14.     At all times relevant to this action, ACS and PCS have operated as a "single employer," "single integrated enterprise," and/or "joint employer" of Plaintiff and other members of the Class, as defined in caselaw and regulations interpreting the New York Labor Law ("NYLL").

15.     ACS and PCS, among other things, share common control (through Sam Klein), common employees, and have many of the same client healthcare facilities. And Defendants have moved workers such as Plaintiff interchangeably from one entity to the other.

16.     Klein has the authority to determine the compensation of nurses and other healthcare workers employed by ACS and PCS.

17.     Klein has acted directly and indirectly in the interests of ACS and PCS in relation to Plaintiff, and in relation to other nurses and healthcare workers employed by ACS and PCS, and has regulated the terms and conditions of Plaintiff, and of other nurses and healthcare workers employed by ACS and PCS.

18.     Klein is an employer of nurses employed by ACS and PCS within the meaning of the NYLL.

19.     Klein, as Chief Executive Officer of ACS and as a Member of PCS, personally benefits from ACS and PCS's profits.

20.     Plaintiff Cherry Lyn Miclat is a Registered Nurse who was recruited, hired, and placed in a nursing position by Defendants.

21.     Plaintiff is a citizen of the Republic of the Philippines and a legal permanent resident of the United States. She lives in New York.

22.     Throughout her employment, each Defendant was an "employer" of Plaintiff as defined by the NYLL.

23.     Throughout her employment, Plaintiff was a non-exempt "employee" of Defendants as defined by the NYLL.

24.     Throughout her employment, Defendants "employed" Plaintiff within the meaning of the NYLL.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over Ms. Miclat's federal claims pursuant to 28 U.S.C. § 1331 (federal question) because Defendants' conduct violates the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589. The Court has subject matter jurisdiction over Ms. Miclat's state law wage and trafficking claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction), as they form part of the same case or controversy.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant ACS resides in Brooklyn, and because all Defendants are residents of New York. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, insofar as Defendants' conduct was directed in part from ACS's Brooklyn office and by individuals based in that office.

## BACKGROUND

### I.      DEFENDANTS' BUSINESS

27.     ACS and PCS are healthcare staffing companies based in New York that recruit trained nurses and other foreign healthcare workers from the Philippines and elsewhere, bring them to the United States, and sell their labor to healthcare facilities, including nursing homes.

28.     Defendants profit by charging healthcare facilities more for healthcare workers' labor than it pays the workers in wages. Therefore, the longer healthcare workers work, the more Defendants profit from their labor.

29.     Defendants' clients (the healthcare facilities) benefit from the arrangement as well through, among other things, obtaining the labor of expert healthcare workers at a time when providers across the country face increasingly serious challenges attracting qualified healthcare workers. Defendants and similar companies that recruit foreign healthcare workers can provide labor that is less expensive than domestic nurse companies.

30.     Defendants' contracts with immigrant nurses include harsh and abusive financial penalties if nurses leave their jobs before the end of a purported commitment period to subject nurses such as Plaintiff and the members of the Class to low wages and deplorable staffing ratios without fear that they will seek out work elsewhere.

31.     Exacerbating the coercive force of these penalties, the contract includes a forced arbitration provision that contains a "loser-pays" cost and fee-shifting provision, which Defendants use to threaten nurses with being subjected to arbitration proceedings and having to pay tens of thousands of dollars of Defendants' legal bills, as well as potentially thousands of dollars in arbitration costs, in the event they decide to leave their jobs.

## II.     PLAINTIFF IS RECRUITED AND FORCED INTO UNFAIR AND ILLEGAL CONTRACTS

32.     Ms. Miclat is an experienced Registered Nurse.

33.     Ms. Miclat worked for years in the Middle East as a nurse and then again as a nurse in the Philippines.

34.     Like many healthcare workers in the Philippines, Ms. Miclat dreamed about becoming a nurse in the United States. She thought coming to the United States would allow career advancement by working for highly regarded healthcare providers.

35.     Lured by the prospect of living the American Dream and aware that nurses in the Philippines could get recruited to work in America, in the spring of 2019, Ms. Miclat contacted ACS about possible work opportunities in America.

36.     Based on representations made by ACS, Ms. Miclat believed she could trust and rely upon the company to bring her to the United States and find her a good job, under good conditions, with fair terms. So she agreed to work for ACS.

37.     In June 2019, ACS required Ms. Miclat to sign a nonnegotiable form contract (the "Old ACS Contract") for nurses that included several pages of fine print and legalese. ACS presented the contract to Ms. Miclat on a take-it-or-leave-it basis.

38.     The Old ACS Contract contained several unfair terms. For example, the Old ACS Contract included a promissory note that required Ms. Miclat to work for ACS for three years. If she left before the end of her three-year term, she would be required to pay $20,000, in addition to all of ACS's costs and expenses (including legal costs and attorney's fees) to enforce the promissory note. Ms. Miclat did not have $20,000 to spend.

39.     The Old ACS Contract also said that Ms. Miclat would not be able to sue ACS in court but had to bring any claim against the company in arbitration. And even though arbitration can cost tens of thousands of dollars in fees and costs, not including the fees Ms. Miclat might have to pay her own lawyer, the contract said that she would have to split those arbitration costs with ACS. Ms. Miclat did not have the money to pay those costs.

40.     However, Ms. Miclat had to sign the Old ACS Contract if she wanted to come to the United States. So she signed.

41.     After Ms. Miclat signed the Old ACS Contract, ACS required her to spend several months fulfilling administrative requirements for placement, including licensure, English proficiency exams, birth certificates, transcripts, visa screening certificates, and medical examination.

42.     Although Ms. Miclat did all of this, she faced delays in receiving a response from United States immigration officials on her paperwork.

43.     In February 2020, Joel Rosario—who worked for both ACS and PCS—told Ms. Miclat that, to "speed up the filing," Defendants were moving her immigration sponsorship from ACS to PCS.

44.     As Mr. Rosario explained, "Sometimes, the period does not match to the date when we planned to file a particular individual so to avoid delay, we allow the other company to petition the individual."

45.     Accordingly, Mr. Rosario told Ms. Miclat that she had to sign another contract, this time with PCS ("Old PCS Contract"). The terms of the Old ACS Contract and the terms of the Old PCS Contract are identical in all material respects, which Mr. Rosario confirmed by stating, "Please don't worry about the terms and conditions of the contract that you signed. You would see that we apply the same terms and condition on both of these contract" and "Having similar management, we follow the same provision and apply the same terms and conditions."

46.     Mr. Rosario also explained via email that PCS and ACS both "cater to the needs of the same list of facilities in New York," i.e., PCS's and ACS's clients.

47.     Ms. Miclat signed the Old PCS Contract.

48.     While Ms. Miclat was waiting for approval to come to the United States, in November 2021, Mr. Rosario told Ms. Miclat that she had to sign a new contract ("New PCS Contract") with PCS. Defendants sent Ms. Miclat the new contract accompanied by a cover letter signed by Sam Klein. Again, having no other options, Ms. Miclat signed the New PCS Contract.

49.     The New PCS Contract—which is identical to a revised ACS contract that Defendants also rolled out to their recruits ("New ACS Contract")—included even more unfair and aggressive provisions than the Old PCS Contract. First, although it no longer included a specific "breach fee," it nevertheless states that if Ms. Miclat were to leave her employment with

PCS early "without good reason," she would owe PCS "all damages and other relief to redress the harm." In essence, Ms. Miclat is still subject to a significant breach fee – but under the New PCS Contract, this fee is of an unknown magnitude.

50.     The New PCS Contract states that PCS's purported damages in the event of a breach would include "significant lost profits (reflecting not only the loss of anticipated profits under this Agreement but also resulting from the impact on [PCS's] relationship with its Clients)."

51.     That is not the only financial harm that PCS suggested it could inflict on Ms. Miclat if she left her job early. In addition to its purported damages, the New PCS Contract suggests in two different places that Ms. Miclat could be on the hook for all of ACS's attorneys' fees and costs.

52.     First, Section 14 of the New PCS Contract specifies that Ms. Miclat is responsible for reimbursing PCS for all "reasonable costs, including all attorney's fees" that it "incurs in enforcing its rights and remedies under the Agreement."

53.     Second, the New PCS Contract's Schedule B, the Dispute Resolution Provision—described in this action as the Arbitration Provision—specifies that the prevailing party in the arbitration, including PCS if it prevailed in any arbitration against Ms. Miclat for leaving her employment before the end of the contract term, would be "reimbursed for its reasonable attorney's fees as well as all costs and fees charged by the AAA and the arbitrator."

54.     Again, Ms. Miclat did not have the money to pay all of these fees and costs.

### III.     PLAINTIFF FACED UNFAIR AND UNDISCLOSED WORKING CONDITIONS IN THE UNITED STATES

55.     In or around early 2022, Ms. Miclat received approval to come to the United States.

56.     PCS placed Ms. Miclat with its client, Morningside Nursing and Rehabilitation Center. She began working there in February of 2022.

57.     Ms. Miclat's work experience was very different from what she had been told to expect. PCS promised a healthy workplace that treated nurses and patients with a basic level of respect but, once she began working at her placement, her working conditions were a far cry from what had been described to her while she was in the Philippines.

58.     The facility was severely understaffed and disorganized. Instead of being assigned to a single unit to learn and focus on those patients, Ms. Miclat was bounced from unit to unit. In fact, within the first two months, she was assigned to work in all seven units of the facility.

59.     Moreover, after completing her regular shift, Ms. Miclat's supervisors and directors of nursing routinely asked her to work an extra shift and pressured her into agreeing.

60.     As a consequence of the long hours and difficult working conditions, Ms. Miclat experienced extreme stress, fatigue, and anxiety.

61.     Prior to her arrival, Defendants told Ms. Miclat she would be entitled to reasonable use of sick leave.

62.     But even after Ms. Miclat underwent an endoscopy for a medical condition and was resting at home, the director of nursing called and asked her to work for at least eight hours.

63.     Ms. Miclat felt she could only decline this request because she was physically unable to work that day, due to ongoing dizziness from anesthesia.

64.     Prior to her signing its contracts, PCS never told Ms. Miclat she would be expected to work even while on sick leave.

65.     Further, Ms. Miclat was unaware that she would often be the only nurse working in her unit, with little to no support from her supervisor.

66.     Making matters worse, the unit was an admitting floor, meaning there were pressing patient medical matters to attend to. Leaving a single nurse responsible for the entire floor was not safe for the nurse or patients.

67.     By way of example, on at least one occasion, Ms. Miclat was left alone with 44 patients, nearly half of whom suffered from dementia and were at high risk of falling.

68.     Despite raising these concerns with facility management, Ms. Miclat received no relief, which came as a surprise because prior to her arrival, PCS led her to believe she would be working with a reasonable nurse-patient ratio and with adequate staffing support.

69.     Exhausted, stressed, and fearing for her license and safety, as well as the safety of her patients, in September 2022, Ms. Miclat contacted Maureen Luy to relay the above-described concerns.

70.     Ms. Luy works in Defendants' Brooklyn offices as the Director of Recruitment and Employee Relations for PCS's and ACS's International Operations Department.

71.     Ms. Luy stated that she would take the concerns to Defendant Klein and get back to Ms. Miclat with a solution.

72.     Ms. Luy told Ms. Miclat that Defendant Klein had spoken to the facility on her behalf. However, there was no discernible improvement to Ms. Miclat's working conditions after that conversation.

73.     Desperate and afraid, Ms. Miclat requested to be transferred to another facility. Defendants failed to respond to her request until after she resigned.

## IV.     PLAINTIFF RESIGNS AND FACES COSTLY ARBITRATION

74.     Ms. Miclat's stress and anxiety continued to grow in light of her unsafe working conditions. She feared for her safety and that of her patients. She feared that she would lose her license if she maintained the unsafe pace and workload.

75.     With two children in school and little to no savings, Ms. Miclat worried that she would be unable to support her family were she to lose her license. But the fear of financial consequences flowing from the contracts Defendants forced her to sign weighed heavily on her mind.

76.     Still, having asked for assistance and received none, and considering the long-term wellbeing of her family, Ms. Miclat had no choice but to resign in October 2022.

77.     By email dated October 27, 2022, Ms. Miclat emailed her resignation, effective November 21, 2022. In her resignation, Ms. Miclat explained that since she began working, she had been "overly exhausted and stressed" due to her high patient workload.

78.     Ms. Miclat received an emailed response from Defendants the following day, stating, in part, "If you do resign on the date you mentioned, please note that it will be considered 'without Good Reason,' and our attorneys will follow up with your attorney regarding next steps."

79.     On December 5, 2022, Defendants sent Ms. Miclat a demand for arbitration, which alleged that Ms. Miclat was responsible for "all available damages, including, without limitation, [PCS's] advanced costs and lost profits," attorneys' fees, and the cost of arbitration.

80.     On December 23, 2022, Ms. Miclat received a notification from the American Arbitration Association ("AAA") that PCS had initiated an arbitration demand. AAA gave Ms. Miclat approximately two weeks to file an answer to the claim, submit a list of witnesses, consultants, attorneys, subsidiaries, and any other related entities or person for AAA to check for potential conflicts, and evaluate ten potential arbitrators, whose fees were up to $7,000 a day.

81.     Ms. Miclat did not know how to respond. She had no idea how arbitration worked and was terrified because she could not pay the money PCS was demanding from her.

82.     After multiple requests to pause the arbitration due to allegations made in a similar case before this Court, *Vidal v. Advanced Care Staffing, LLC*, No. 22-cv-05535 (NRM) (MMH), AAA finally paused the arbitration against Ms. Miclat to await the outcome of the pending appeal in *Vidal*.

## V.     ACS AND PCS JOINTLY EMPLOY PLAINTIFF AND OTHER RECRUITED HEALTHCARE WORKERS

83.     ACS and PCS each have their principal place of business in New York.

84.     ACS and PCS are so closely related that they are essentially a single employer, single integrated enterprise, and/or joint employer.

85.     Together, they employed Plaintiff and other foreign healthcare workers that they recruit to work in the United States. They continue to jointly employ such healthcare workers today.

86.     Mr. Klein is the Chief Executive Officer of both PCS and ACS and previously served as Chief Operating Officer for both companies.

87.     According to one LinkedIn profile for Mr. Klein, Mr. Klein is the CEO of both PCS and ACS.[2] According to another LinkedIn profile for Mr. Klein, Mr. Klein is the CEO of ACS, and was formerly COO of ACS.[3]

88.     Mr. Klein signs employment contracts with nurses on behalf of both ACS and PCS.

89.     In fact, Mr. Klein personally signed all of Ms. Miclat's contracts with ACS and PCS.

90.     Klein has also signed other nurses' contracts with ACS and PCS.

---

[2] *See* https://www.linkedin.com/in/sam-klein-434429233/ (accessed July 6, 2023).

[3] *See* https://www.linkedin.com/in/sam-klein-69105a64/ (accessed July 6, 2023).

91.    Concerns that nurses have with ACS and PCS, or with their placements/working conditions, are directed to Mr. Klein as the final decision maker.

92.    Mr. Klein is also involved in attempting to resolve conflicts or concerns between nurses and their placement facilities, including as to Ms. Miclat.

93.    PCS and ACS have additional similar and overlapping management and staff.

94.    For example, Ms. Luy serves as ACS's and PCS's International Recruitment and Employee Relations Director.

95.    Liz Jurado likewise is a recruiter for both ACS and PCS.

96.    According to one LinkedIn profile, Ms. Jurado is based in Brooklyn and works as Head Recruiter for ACS.[4] According to a LinkedIn page for PCS, Ms. Jurado is an employee of PCS.[5]

97.    According to another LinkedIn profile, Ms. Jurado is currently the Human Resources and Special Projects Director for PCS, and has served in that role since approximately June 2017.[6] According to the same profile, Ms. Jurado is also currently the Human Resources Director for ACS, and has served in that role since approximately December 2008.[7]

98.    ACS and PCS share an "International Department," through which recruiting occurs. The International Department recruited Ms. Miclat and other nurses.

99.    ACS and PCS have many of the same clients. In other words, they cater to the needs of many of the same healthcare facilities.

---

[4] *See* https://www.linkedin.com/in/liz-jurado-42144b40 (accessed July 6, 2023).

[5] *See* https://www.linkedin.com/company/priority-care-staffing (accessed July 6, 2023).

[6] *See* https://www.linkedin.com/in/liz-jurado-6087b510 (accessed July 6, 2023).

[7] *Id.*

100.    ACS and PCS function interchangeably with respect to petitioning for their recruits' visas. For example, when Ms. Miclat's visa application was taking some time, ACS and PCS chose to change the petitioning party from ACS to PCS to expedite the paperwork.

101.    ACS and PCS also function interchangeably by using employees who signed a contract with one company to fulfill the needs of either company's clients.

102.    ACS and PCS share the same outside counsel, who represents them in the arbitrations they bring against healthcare workers who dare to leave their jobs before the end of the three-year period.

103.    The contracts ACS and PCS have with healthcare workers like Ms. Miclat are the same in all material respects.

104.    This is true for contract revisions, as well. That is, the ACS and PCS New Contracts are materially the same.

105.    ACS and PCS also share the same marketing agency, SkyCare Media.

## VI.    PLAINTIFF'S INABILITY TO PAY ATTORNEY'S FEES, THE COSTS OF THE PENDING ARBITRATION PROCEEDING, OR DEFENDANTS' ALLEGED "LOST PROFITS"

106.    Plaintiff cannot afford to pay Defendant's attorney's fees and the costs of the pending arbitration.

107.    Plaintiff is an hourly-paid, at-will employee who earns approximately $1600 per week, after taxes are taken out. A major portion of her pay goes directly to rent. The remainder goes to basic living expenses such as household bills, food, and transportation costs.

108.    Ms. Miclat cannot afford to pay the arbitration costs of the pending arbitration proceeding, let alone PCS's attorney's fees.

109.    The costs of arbitration at the AAA include a filing fee of $1,900, and a case management fee of $750, all of which Defendants could potentially recover from Ms. Miclat if they were to prevail in the arbitration.

110.    The costs of arbitration also include the arbitrator's compensation. In a similar arbitration proceeding initiated in *Vidal*, the arbitrator's hourly rate was $450 per hour. If an arbitration against Ms. Miclat were to continue, the rate of the arbitrator selected could be even higher.

111.    Ultimately, the arbitrator's time alone in any proceeding would likely cost thousands of dollars, if not tens of thousands of dollars—all of which Defendants could potentially recover from Ms. Miclat if they were to prevail in the arbitration.

112.    Under the Arbitration Provision, Ms. Miclat would also be required to pay PCS's attorney's fees and costs. Those fees could easily run into the tens of thousands of dollars or more.

113.    Ms. Miclat lacks the means to pay her own attorney to represent her in the arbitration – let alone the arbitrator's compensation or the potentially enormous attorneys' fees and costs incurred by Defendants.

114.    Ms. Miclat also cannot afford to pay some unknowably large amount of "lost profits" that has been claimed by Defendants.

115.    As the Court in *Vidal* observed, "[w]hether the amount is fixed or projected, employers' threats to collect tens of thousands of dollars in contractual damages from hourly workers certainly can violate the TVPA's prohibitions on forced labor."

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff asserts claims on behalf of and seeks to represent the follow Class: All healthcare workers who entered the United States through Defendants' foreign nurse

recruitment program, and who were subject to Defendants' contracts containing forced arbitration provisions, within the statute of limitations.

117.    Plaintiff reserves the right to amend and refine the class definition above or add classes and/or subclasses as litigation progresses.

118.    Numerosity: The Class is so numerous that joinder of all class members is impracticable. ACS's website states that it has placed thousands of nurses in jobs throughout the New York-New Jersey-Connecticut region.[8] ACS's LinkedIn profile indicates that it employs between 1,001 and 5,000 employees.[9] PCS's social media profiles indicate it employs between 501-1,000 employees.[10] Although the precise number of putative Class members is currently unknown, Plaintiff believes that the Class includes more than forty members. These members can be identified based on Defendants' records, which would include information on employees' placement, length of employment and commitment period, and pay. Defendants' pattern of initiating arbitration proceedings against early-departing employees indicates that they have maintained this data.

119.    Commonality: Common questions of law and fact exist as to all members of all Classes and predominate over any questions solely affecting individual members, including but not limited to:

(a) Whether Defendants obtain the labor of foreign healthcare workers by using serious harm or threats of serious harm in violation of the TVPA and New York trafficking law;

---

[8] *See* Advanced Care Staffing, "About," https://advancedcarestaffing.com/about/ (accessed July 6, 2023).

[9] *See* https://www.linkedin.com/company/advanced-care-staffing/about/, at "Company Size" (accessed July 6, 2023).

[10] *See* https://www.linkedin.com/company/priority-care-staffing/about/, at "Company Size" (accessed July 6, 2023).

(b) Whether Defendants' uniform practices surrounding the commitment period, monetary penalty, and conditions of work constitute attempted labor trafficking in violation of the TVPA;

(c) Whether Defendants knowingly recruit healthcare workers and knowingly benefit by their violations of the TVPA and New York trafficking law;

(d) Whether enforcement of Defendants' arbitration provision would violate NYLL by bringing wages below minimum wage;

(e) Whether Defendants' attempt to recoup lost profits, attorneys' fees, and arbitration costs constitute an unlawful kickback under the NYLL;

(f) Whether Defendants' attempt to recoup lost profits, attorneys' fees, and arbitration costs constitute an unlawful deduction under the NYLL;

(g) The proper measure of damages; and

(h) The proper measure of punitive damages.

120.    These common questions arise, in part, because of the uniform circumstances under which Plaintiff and the Class worked. These include the form contracts and workplace policies that resulted in a standard environment and set of employer-mandated conditions that employees were forced to abide by under the same threat of legal action and serious financial harm.

121.    Typicality: Plaintiff's claims are typical of the members of the Class for the reasons set forth above. All members of the Class were subject to Defendants' uniform contracts. Defendants treated Plaintiff consistently with other class members, in accordance with their standard policies and practices.

122.    Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to the prosecution of this action and has retained counsel that numerous

courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts between Plaintiff and the Class she seeks to represent.

123.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants use a uniform contract and uniform policies and practices, resulting in common violations of law. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum. To the extent any other litigation exists, it was more likely than not initiated by Defendants as part of their pattern of obtaining forced labor by suing its former workers.

124.     Common questions of law and fact also predominate as to Plaintiff's claim that Defendants attempted to obtain forced labor in violation of law. Defendants attempted to keep every healthcare worker in their employ through the threats of severe penalties and legal action, as well as through conditions of employment. That attempt—regardless of whether an employee could eventually pay the severe monetary penalty or the degree to which they were misled and forced to work against their will—was the same and uniformly made as to each and every employee.

125.     Plaintiff intends to send notice to all members of the Class to the extent required by Fed. R. Civ. P. 23(c)(2). The names and addresses of the class members are available from Defendants' records.

**COUNT I: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589(a), ON BEHALF OF MICLAT AND THE CLASS**

126.    It is a violation of the TVPA to "knowingly provide[ ] or obtain[ ] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

127.    The TVPA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services to avoid incurring that harm." *Id.* § 1589(c)(2).

128.    Defendants obtained the labor of Ms. Miclat and the Class through threats of serious harm, through a scheme to make Ms. Miclat and members of the Class believe they would suffer serious harm, through threatened abuse of its Arbitration Provision, including threats that employees will be responsible for paying Defendants' attorney's fees and the costs of arbitration, including arbitrator compensation, if they leave their jobs.

129.    These threats constitute the "threatened abuse of legal process" and/or a threat of "serious harm," in violation of 18 U.S.C. § 1589(a)(2)–(3).

130.    Defendants knowingly employed such threats to exert pressure on Plaintiff and to the Class to prevent employees from seeking employment elsewhere. This was done with the purpose of obtaining continued labor.

131.    Defendants' use of such means to obtain Plaintiff's labor was knowing and intentional.

132.    Plaintiff and the Class have suffered damages because of Defendants' conduct. Those damages include emotional distress and other damages.

133.    Plaintiff and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT II: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1589(b), ON BEHALF OF MICLAT AND THE CLASS

134.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

135.    It is a violation of the TVPA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

136.    Defendants have knowingly benefited from their participation in the forced labor venture described herein by earning substantial profits from the venture.

137.    Defendants knew or recklessly disregarded the fact that the venture described herein engaged in obtaining forced labor.

138.    Plaintiff and the Class have suffered damages because of Defendants' conduct. Those damages include emotional distress and other damages.

139.    Plaintiff and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT III: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1590(a), ON BEHALF OF MICLAT AND THE CLASS

140.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

141.    It is a violation of the TVPA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPA.

142.    Defendants knowingly and purposefully recruited Plaintiff and Class members, as described herein, in violation of the TVPA.

143.    Plaintiff and the Class suffered damages as a result of Defendants' conduct, including emotional distress and other damages.

144.    Plaintiff and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT IV: VIOLATION OF THE TRAFFICKING VICTIM PROTECTIONS ACT, 18 U.S.C. § 1594(a), ON BEHALF OF MICLAT AND THE CLASS

145.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

146.    Attempts to violate the TVPA are themselves violations of the TVPA. 18 U.S.C. § 1594(a).

147.    Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

148.    Plaintiff and the Class suffered damages as a result of Defendants' conduct, including emotional distress and other damages. The penalty amount is determinable from Defendants' records.

149.    Plaintiff and the Class are entitled, under 18 U.S.C. § 1595, to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT V: VIOLATION OF NEW YORK'S PROHIBITION ON LABOR TRAFFICKING, N.Y. SOC. SERV. LAW § 483-BB, ON BEHALF OF MICLAT AND THE CLASS

150.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

151.     It is a violation of New York's labor trafficking law to "engag[e] in any scheme, plan, or pattern to compel or induce [another] to engage in or continue to engage in labor activity by means of instilling a fear in such person that, if the demand is not complied with, the actor or another will . . . cause damage to property[.]" N.Y. Penal Law § 135.35.

152.     N.Y. Soc. Serv. Law § 483-bb empowers a victim of labor trafficking law to bring a civil action against whoever knowingly advances or profits from the trafficking, including conduct prohibited by N.Y. Penal Law § 135.35.

153.     Defendants obtained the labor of Ms. Miclat and the Class through threats of serious harm and a scheme to make Ms. Miclat and members of the Class believe they would suffer serious monetary harm if they declined to work for Defendants. For example, through the arbitration provision, Defendants compelled or induced Plaintiff's and the Class's labor by requiring her to work in order to retire, repay, or service a purported debt, in the form of Defendants' attorney's fees and arbitration costs, including arbitrator compensation, that could run into the tens of thousands of dollars.

154.     Defendants engaged in an ongoing course of conduct with intent to extract labor from Plaintiff and the Class from the Philippines and intentionally deceiving them as to the nature of their work in the United States. Specifically, Defendants represented that Plaintiff and the Class could achieve the "American Dream" and would have a manageable patient caseload, when in fact Defendants knew that Plaintiff and the Class would be assigned a patient caseload that placed their nursing licenses and the health of those patients at risk.

**COUNT VI: VIOLATION OF NYLL § 650 *ET SEQ.*, ON BEHALF OF MICLAT AND THE CLASS, BECAUSE DEFENDANTS' CONTRACT REDUCES WAGES BELOW THE STATE MINIMUM WAGE**

155.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

156.    When Plaintiff and the Class worked for ACS and PCS, they were employed within the meaning of NYLL §§ 2 and 651.

157.    At all relevant times, ACS and PCS were employers within the meaning of the NYLL.

158.    The arbitration provision is intended to achieve purposes that are illegal under the NYLL, as it is aims to force Plaintiff and the Class to pay Defendants' attorney's fees and costs of arbitration, including arbitrator compensation—costs that are principally for its own benefit—and thus reduce the wages of Plaintiff and the Class during the last workweek below the state minimum wage.

159.    The arbitration provision is thus illegal and unenforceable, under the NYLL because it would, if enforced, permit Defendants to pay their workers wages that are below the state minimum wage.

160.    In her last workweek of work, for the pay period ending November 19, 2022, Plaintiff worked approximately 36.5 hours, for which she was paid approximately $1385.10. Her hourly wage for that work was approximately $38 per hour. However, this amount was subject to the scheme described above, and she was therefore not paid these wages "free and clear," as the NYLL requires.

161.    In satisfying its state minimum wage obligations, Defendants may not seek to recover costs or damages that are primarily for its own benefit. In this case, such costs include,

among other purported damages, Defendants' purported "lost profits," Defendants' attorney's fees, and the costs of arbitration, including arbitrator compensation.

162.     Accordingly, because the recovery of damages such as "lost profits," attorney's fees, or costs of arbitration would reduce Plaintiff's and the Class's wages in the last week of employment to $0, below the state minimum wage, the enforcement of the Arbitration Provision would violate the NYLL.

163.     Additionally, the arbitration provision's requirement that employees pay Defendants' attorney's fees and the costs of arbitration if Defendants prevail in the arbitration is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

### COUNT VII: VIOLATION OF NYLL § 198-b, ON BEHALF OF MICLAT AND THE CLASS, BECAUSE DEFENDANTS' CONTRACT FORCES EMPLOYEES TO PROVIDE AN ILLEGAL KICKBACK

164.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

165.     When Ms. Miclat worked for PCS, she was employed within the meaning of NYLL §§ 2 and 651.

166.     At all relevant times, ACS and PCS were employers within the meaning of the NYLL.

167.     The arbitration provision is illegal under the NYLL, as it was intended to force Ms. Miclat and the Class to provide a kickback against their wages to Defendants should employees leave before the end of their contract term, thus resulting in payment during the final work week that falls below the legally-required wage for all hours worked.

168.    In her last workweek of work, for the pay period ending November 19, 2022, Plaintiff worked approximately 36.5 hours, for which she was paid approximately $1385.10. Her hourly wage for that work was approximately $38 per hour. However, these amounts were subject to the scheme described above, and she was therefore not paid these wages "free and clear," as the NYLL requires.

169.    In satisfying its minimum wage obligations, Defendants may not seek to recover costs or damages that are primarily for its own benefit.

170.    Any attorney's fees or arbitration costs incurred in seeking to collect an illegal kickback under the NYLL are themselves illegal kickbacks under the NYLL. Thus, the provision allowing Defendant to recover its attorney's fees and arbitration costs is invalid under the NYLL.

171.    Additionally, the arbitration provision's requirement that Plaintiff pay Defendants' attorney's fees and the costs of arbitration if Defendants prevails in the arbitration, is inconsistent with the one-way fee shifting provision in the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

**COUNT VIII: VIOLATION OF NYLL § 193, ON BEHALF OF MICLAT AND THE CLASS, BECAUSE DEFENDANTS' CONTRACT, IF ENFORCED, WOULD RESULT IN AN ILLEGAL DEDUCTION OF WAGES**

172.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth here.

173.    When Ms. Miclat worked for PCS, she was employed within the meaning of NYLL §§ 2 and 651.

174.    At all relevant times, PCS and ACS were employers within the meaning of the NYLL.

175.     The arbitration provision is illegal and unenforceable under the NYLL, as it was intended to allow Defendants to make illegal deductions from employee pay when they leave prior to the end of their contract term.

176.     The arbitration provision purports to permit Defendants to recover attorney's fees and arbitration costs in conjunction with the recovery of an illegal deduction that is not authorized in writing under the NYLL.

177.     In the course of satisfying its obligations under the NYLL, Defendants may only deduct from employee wages those deductions that are expressly authorized in writing by Plaintiff, as required by statute, and that are for the benefit of Plaintiff.

178.     Defendants seek to deduct from employee wages their lost profits as well as arbitration costs and attorney's fees. Such deductions are unlawful under NYLL § 193.

179.     Any attorney's fees or arbitration costs incurred in seeking to collect an illegal deduction under the NYLL are themselves illegal deductions under the NYLL. Thus, the Arbitration Provision is invalid under the NYLL.

180.     Additionally, the arbitration provision requires that Plaintiff pay Defendants' attorney's fees and the costs of arbitration if Defendants prevail in the arbitration. This provision is invalid under the NYLL, which allows prevailing employees, but not employers, to recover their reasonable attorney's fees in actions brought under the NYLL.

### Demand for Jury Trial

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of herself and the Class, demands a trial by jury as to all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for relief as follows:

(a) determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3);

(b) designating Plaintiff as representative for the Class and designating Plaintiff's counsel as counsel for the Class;

(c) issuing proper notice to the Class at Defendants' expense;

(d) declaring that Defendants committed violations of the TVPA, New York's human trafficking law, and New York wage laws;

(e) permanently enjoining Defendants from further violations of the TVPA, New York's human trafficking law, and New York wage laws;

(f) awarding damages as provided by the TVPA, New York's human trafficking law, and New York wage laws, including punitive damages;

(g) awarding reasonable attorneys' fees and costs as provided by law; and

(h) granting further relief, in law or equity, as this Court may deem appropriate and just, including all relief authorized by the TVPA, New York's human trafficking law, and the NYLL.

DATED:     July 12, 2023
           Brooklyn, New York

**KAKALEC LAW PLLC**

Hugh Baran (he/him)
Patricia Kakalec (she/her)
Kakalec Law PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
(212) 705-8730
Hugh@KakalecLaw.com
Patricia@KakalecLaw.com

**TOWARDS JUSTICE**

Juno Turner (she/her)

David H. Seligman (he/him)
(*pro hac vice* motion forthcoming)
Valerie Collins (she/her)
(*pro hac vice* motion forthcoming)
Towards Justice
P.O. Box 371689, PMB 44465
Denver, CO 80237-5680
(720) 441-2236
juno@towardsjustice.org
david@towardsjustice.org
valerie@towardsjustice.org

**NICHOLS KASTER, PLLP**

Anna P. Prakash (she/her), MN Bar No. 0351362
(*pro hac vice* motion forthcoming)
Joshua Cottle (he/him), NY Bar No. 5914676
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
aprakash@nka.com
jcottle@nka.com

**NICHOLS KASTER, LLP**

Matthew C. Helland (he/him), CA Bar No. 250451
(*pro hac vice* motion forthcoming)
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238
helland@nka.com

*Attorneys for Plaintiff*